UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:09CV-00071-JHM

WESLEY A. LINDSEY and
REGINA LINDSEY, his wife                                    PLAINTIFFS

VS.

CARGOTEC USA, INC., et al.                                  DEFENDANTS

MEMORANDUM OPINION AND ORDER

This matter is before the Court upon a renewed motion by Defendant, Moffett Engineering,

Ltd. ("Moffett"), to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) [DN

82]. At the request of the Court, the parties submitted supplemental briefs addressing whether

personal jurisdiction exists over Moffett in light of three new cases, J. McIntyre Machinery, Ltd. v.

Nicastro, 131 S.Ct. 2780 (2011); Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846

(2011); Caesars Riverboat Casino, LLC v. Beach, 336 S.W.3d 51 (Ky. 2011). Fully briefed, this

motion is ripe for decision. For the reasons set forth below, Defendant's motion to dismiss pursuant

to Fed. R. Civ. P. 12(b)(2) is granted.

I. BACKGROUND

On August 21, 2008, Plaintiff Wesley Lindsey ("Lindsey") was employed and working as

a chicken catcher for Perdue Farms at its manufacturing plaint in Cromwell, Kentucky. (Pl. Comp.,

Count III, ¶ 3). On this date, Lindsey was assigned to assist in the catching of chickens for

processing. (Id. ¶ 4). At that same time, a co-worker was operating a Moffett forklift in the same

general area and was assisting Lindsey and other workers in the moving of chicken crates. (Id. ¶ 5).

At some point during the work day, the co-worker operating the forklift ran over Lindsey's left leg,

foot, and ankle.  (Id. ¶ 7).  Plaintiffs claim that this injury was a result of the defective design and manufacture of the forklift that caused the co-worker's visual field to be blocked.  (Id. ¶ 6). Plaintiffs filed suit against Moffett USA, Inc. ("Moffett"), the forklift manufacturer, and Cargotec USA, Inc./Hiab, Inc. ("Cargotec"), the forklift distributor, for strict liability, negligence, and failure to warn.  Lindsey's wife, Regina Lindsey, asserts a claim for loss of consortium.

After limited discovery on the personal jurisdiction issue, Moffett filed a motion to dismiss for lack of personal jurisdiction arguing that it is not subject to the jurisdiction of this Court because it has not purposefully availed itself of the privilege of doing business in the Commonwealth of Kentucky.  Moffett is a foreign corporation with its principal place of business located in Dundalk, Ireland (Id. Count I, ¶ 6).  Moffett asserts that their only contact in the United States is with a single customer, Cargotec, which is located in Ohio.  Moffett claims that it and Cargotec are separate corporate entities, and that Moffett has no control or knowledge as to where in the United States that Cargotec is selling Moffett's products.  In response, Plaintiffs argue that the nationwide distribution agreement between Moffett and Cargotec, Moffett's production of operator manuals for the forklifts, warranty claim forms submitted by Cargotec to Moffett, and Cargotec's website demonstrate that Moffett is subject to the personal jurisdiction of Kentucky.

## II. STANDARD OF REVIEW

Defendant has moved for dismissal based on a lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  "The plaintiff bears the burden of establishing that jurisdiction exists." Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991).  "Where the Court elects to rule on the matter based upon the pleadings and other documentary evidence, a plaintiff need only establish a prima facie case for jurisdiction."  Smith v. Ohio Legal Rights Service, 2011 WL 1627322, *2

(S.D. Ohio April 29, 2011)(citing Bridgeport Music, Inc. v. Still N The Water Publ'g, 327 F.3d 472,

478 (6th Cir. 2003)).  See also Shea v. Bonutti Research, Inc., 2011 WL 53473, *2 (S.D. Ohio Jan.

7, 2011)("[E]ven if there has been discovery, as there has been in the instant action, in the absence

of an evidentiary hearing a court will generally apply a *prima facie* standard weighing the evidence

in the light most favorable to the plaintiff." Id. (citing Dean v. Motel 6 Operating L.P., 134 F.3d

1269, 1272 (6th Cir. 1998)).

### III.  DISCUSSION

In a diversity case, a federal court determines whether personal jurisdiction exists over a

nonresident defendant by applying the law of the state in which it sits.  Third Nat'l Bank in

Nashville v. WEDGE Group Inc., 882 F.2d 1087, 1089 (6th Cir. 1989).  The Court applies a two-

step inquiry to determine whether it may exercise personal jurisdiction over a non-resident

defendant: "(1) whether the law of the state in which the district court sits authorizes jurisdiction,

and (2) whether the exercise of jurisdiction comports with the Due Process Clause."  Brunner v.

Hampson, 441 F.3d 457, 463 (6th Cir. 2006).  The district court's exercise of jurisdiction over an

out-of-state defendant must be consistent with both the forum state's long-arm statute[1] and the

constitutional requirements of due process.  Id.; CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262

(6th Cir. 2007); Appriss Inc. v. Information Strategies, Inc., 2011 WL 3585890, *2 (W.D. Ky. Aug.

16, 2011).  Because the assertion of personal jurisdiction over Moffett violates due process, the

Court will proceed directly to that analysis.  See Appriss, Inc., 2011 WL 3585890, *2; see also

---

[1]  In the recent case Caesars Riverboat Casino, LLC v. Beach, 336 S.W.3d 51 (Ky. 2011),
the Kentucky Supreme Court overruled Wilson v. Case, 85 S.W.3d 589 (Ky. 2002) and
Cummings v. Pitman, 239 S.W.3d 77 (Ky. 2007) finding that Kentucky's long-arm statute, KRS
§ 454.210, is not "subsumed by federal due process standards for exercising *in personam*
jurisdiction over nonresidents."  Hinners v. Robey, 336 S.W.3d 891, 895 (Ky. March 24, 2011).

Gerber v. Riordan, 649 F.3d 514,  2011 WL 3611455, *3 (6th Cir. Aug. 18, 2011).

## A.  Due Process Clause

The question before the Court is whether the exercise of personal jurisdiction would violate the Due Process Clause of the United States Constitution.  For the assertion of personal jurisdiction over a nonresident defendant, due process requires sufficient contacts between the nonresident defendant and the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" J. McIntyre Machinery Ltd. v. Nicastro, 131 S.Ct. 2780, 2787 (2011) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2853 (2011); Cheyenne Productions, S.A. v. Berry, 2011 WL 4014368, *3 (E.D. Mo. Sept. 9, 2011).

"Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state." Gerber v. Riordan, 649 F.3d 514, 2011 WL 3611455, *3 (6th Cir. August 18, 2011)(citation omitted).  "'General jurisdiction is proper only where a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.'" Id. (quoting Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002)).  Specific jurisdiction, however, is proper only "'in a suit arising out of or related to the defendant's contacts with the forum.'" Id. (quoting Bird, 289 F.3d at 874).  In this case, Moffett's contacts with Kentucky are insufficient to support general jurisdiction.[2]  Therefore, the question is

---

[2] Throughout this litigation, Plaintiffs addressed only the requirements of specific jurisdiction.  However, in the recent supplemental briefs ordered by the Court, Plaintiffs in their discussion of Goodyear, 131 S.Ct. 2846 (2011), appear to briefly argue that Moffett may be subject to general jurisdiction.  Such an argument is without merit.  Moffett's contacts with Kentucky cannot be characterized as "continuous and systematic" to support general jurisdiction.

whether the court has personal jurisdiction over Moffett based on specific jurisdiction.

The Sixth Circuit conducts a three-part test for determining whether, consistent with due process, personal jurisdiction may be exercised over a defendant. "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." Southern Mach. Co. v. Mohasco Industries, Inc., 401 F.2d 374, 381 (6th Cir. 1968); see also Third Nat. Bank in Nashville v. WEDGE Group, Inc., 882 F.2d 1087, 1089-90 (6th Cir. 1989).

### B.  Purposeful Availment

Under the first prong of the Mohasco test, Plaintiffs must establish that Moffett purposefully availed itself of the privilege of acting in Kentucky or causing consequences in Kentucky. Jurisdiction is proper under the purposeful availment requirement "where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).   Moreover, the defendant's conduct and connection with the forum must be of a character that he or she should reasonably anticipate being haled into court there. Id. at 474. "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts' or of the 'unilateral activity of another party or third person.'" Id. at 475.  See also Bridgeport, 327 F.3d at 478 (internal quotations and citation omitted). "The emphasis in the purposeful availment inquiry is whether the defendant has engaged in 'some overt actions

connecting the defendant with the forum state.'" Bridgeport, 327 F.3d at 478 (quoting Dean v.
Motel 6 Operating L.P., 134 F.3d 1269, 1274 (6th Cir.1998)). "If a plaintiff can demonstrate
purposeful availment, the absence of physical contacts with the forum state will not defeat personal
jurisdiction over a non-resident defendant." Id. at 479.

### 1. Stream of Commerce "Plus" Theory

In Asahi Metal Indus. Co. v. Superior Court of Calif., 480 U.S. 102 (1987), the Supreme
Court "debated whether a foreign manufacturer that places a product in the stream of commerce
purposefully avails itself of the privilege of conducting business in a state where the product
ultimately is found." Bridgeport, 327 F.3d at 479. Asahi was a Japanese company that
manufactured tire valves, which Asahi sold to a Taiwanese manufacturer of tire tubes. Plaintiff was
injured when the tire of his motorcycle equipped with an Asahi valve burst. Plaintiff had purchased
the motorcycle in California. He sued Asahi in California. The Supreme Court ruled that the district
court lacked personal jurisdiction over Asahi, although no opinion commanded the support of a
majority of the Court. See Fortis Corporate Ins. v. Viken Ship Management, 450 F.3d 214, 218 (6th
Cir. 2006). The Supreme Court ultimately issued a split decision as to whether foreseeability alone
was enough to subject the foreign manufacturer to personal jurisdiction in a California court based
on the stream of commerce theory.

Justice O'Connor's plurality opinion held that the "placement of a product into the stream
of commerce, without more, is not an act of the defendant purposefully directed toward the forum
State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in
the forum state, for example, designing the product for the market in the forum State, advertising
in the forum State, establishing channels for providing regular advice to customers in the forum

6

State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Asahi, 480 U.S. at 112. This formulation came to be known as "stream of commerce plus." Fortis, 450 F.3d at 218.

In contrast, Justice Brennan, concurring in part and in the judgment, concluded that a non-resident defendant's awareness "that the final product is being marketed in the forum State" is sufficient to meet the purposeful availment requirement. Asahi, 480 U.S. at 117. Specifically, Justice Brennan concluded that "[a] defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State." Id.

The Sixth Circuit has adopted Justice O'Connor's approach to purposeful availment as articulated in Asahi Metal Industry Company, Ltd. v. Superior Court, 480 U.S. 102 (1987) (O'Connor, J.). See Bridgeport, 327 F.3d at 480("[W]e make clear today our preference for Justice O'Connor's stream of commerce 'plus' approach . . . ."); Smith v. Home Depot USA, Inc., 294 Fed. Appx. 186, 189 (6th Cir. 2008); Fortis Corporate Ins. v. Viken Ship Management, 450 F.3d 214, 218-219 (6th Cir. 2006); Read v. Lifeweaver, LLC, 2010 WL 1798704, *5 (E.D. Tenn. May 5, 2010). Thus, in the Sixth Circuit, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Asahi, 480 U.S. at 112.

### 2.  *J. McIntyre Machinery, Ltd. v. Nicastro*

The United States Supreme Court recently addressed the stream of commerce theory in J.

McIntyre Machinery, Ltd. v. Nicastro, 131 S.Ct. 2780 (2011).  In McIntyre, a British manufacturer, J. McIntyre, designed and manufactured scrap metal machines.  The plaintiff, an employee of a scrap metal company based in New Jersey, was seriously injured by the machine.  Plaintiff brought a products liability claim against J. McIntyre in New Jersey.  The New Jersey Supreme Court concluded that New Jersey courts could exercise jurisdiction over J. McIntyre without contravention of the Due Process Clause based on the "stream of commerce" doctrine.  The New Jersey Supreme Court held that a manufacturer is subject to jurisdiction for a products liability action so long as it "'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" McIntyre, 131 S.Ct. at 2793 (J. Breyer, concurrence)(quoting Nicastro v. McIntyre Machinery America, Ltd., 987 A.2d 575, 592 (N.J. 2010)).

The New Jersey Supreme Court concluded that jurisdiction was proper based on the following facts:  (1)  a distributor agreed to sell J. McIntyre's machines in the United States; (2) J. McIntyre took no steps to prevent distribution of its products in New Jersey; (3) J. McIntyre officials attended trade shows in several States along side the distributor but not in New Jersey; (4) up to four machines ended up in New Jersey; (5) J. McIntyre held both United States and European patents for the technology; (6) the United States distributor structured its advertising and sales efforts in accordance with J. McIntyre's direction and guidance whenever possible; (7) some of the machines were sold on consignment to the distributor; and (8) the injury occurred in New Jersey.  The record further reflects that the foreign manufacturer "had no office in New Jersey; it neither paid taxes nor owned property there; . . . it neither advertised in, nor sent any employees to, the State;" and it did not sell its machines directly to other buyers in the United States.

8

The United States Supreme Court reversed the decision of the New Jersey Supreme Court finding the above facts insufficient to confer personal jurisdiction over the foreign manufacturer because the plaintiff failed to demonstrate the foreign manufacturer purposefully availed itself of the forum State's market.   Unfortunately, the Supreme Court once again issued a split decision as to whether mere foreseeability was enough to subject a foreign manufacturer to personal jurisdiction in a forum State under the stream of commerce theory.  McIntyre, 131 S.Ct. 2780; See also Asahi, 480 U.S. 102.

Justice Kennedy delivered the judgment of the Court and wrote an opinion for a four-justice plurality clearly rejecting the argument that mere foreseeability or awareness that the final product is being marketed in the forum State is sufficient to meet the requirements of the Due Process Clause.  McIntyre, 131 S.Ct. at 2788.  According to Justice Kennedy, "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis. The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."  Id. at 2789.  Justice Kennedy also concluded that "[b]ecause the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State."  Id.  Based on the facts set forth above, Justice Kennedy concluded that "[a]t no time did petitioner engage in any activities in New Jersey [as opposed to the United States] that reveal an intent to invoke or benefit from the protection of its laws."  Id. at 2791.   Justice Ginsberg wrote a dissenting opinion, joined by two other Justices, concluding that when there is "a local plaintiff injured by the activity of a manufacturer seeking to exploit a multistate or global market . . . jurisdiction is appropriately exercised by courts of the place

where the product was sold and caused injury." Id. at 2804.

Justice Breyer wrote a concurring opinion, joined by Justice Alito, in which he declined to adopt either Justice Kennedy's plurality opinion or Justice Ginsburg's dissent. Id. at 2793. "[A]dher[ing] strictly to [Supreme Court] precedents and the limited facts found by the New Jersey Supreme Court," Justice Breyer concluded that the plaintiff failed to meet his burden of demonstrating that it was constitutionally proper to exercise jurisdiction over the foreign manufacturer. Id. at 2794. Specifically, Justice Breyer stated:

> None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, this Court's previous holdings suggest the contrary. The Court has held that a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction. See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place. See Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty., 480 U.S. 102, 111, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (opinion of O'Connor, J.) (requiring "something more" than simply placing "a product into the stream of commerce," even if defendant is "awar[e]" that the stream "may or will sweep the product into the forum State"); id., at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part and concurring in judgment) (jurisdiction should lie where a sale in a State is part of "the regular and anticipated flow" of commerce into the State, but not where that sale is only an "edd[y]," i.e., an isolated occurrence); id., at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part and concurring in judgment) (indicating that "the volume, the value, and the hazardous character" of a good may affect the jurisdictional inquiry and emphasizing Asahi's "regular course of dealing").

> Here, the relevant facts found by the New Jersey Supreme Court show no "regular ... flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting

10

activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users. World–Wide Volkswagen, supra, at 297–298, 100 S.Ct. 559 (internal quotation marks omitted).

McIntyre, 131 S.Ct. at 2792.

Because the Supreme Court in McIntyre did not conclusively "define the breadth and scope of the stream of commerce theory, as there was not a majority consensus on a singular test," Oticon, Inc., 2011 WL 3702423, *9, and given Justice Breyer's decision to rely on current Supreme Court precedents, the Court will continue to adhere to the Sixth Circuit's analysis of purposeful availment. Bridgeport Music, Inc. v. Still N The Water Publ'g, 327 F.3d 472, 480 (6th Cir. 2003); Smith v. Home Depot USA, Inc., 294 Fed. Appx. 186, 189 (6th Cir. 2008); Fortis Corporate Ins. v. Viken Ship Management, 450 F.3d 214, 218-219 (6th Cir. 2006). See also Ainsworth v. Cargotec, USA, Inc., 2011 WL 4443626 (S.D. Miss. Sept. 23, 2011)("As Justice Breyer declined to choose between the *Asahi* plurality opinions, *McIntyre* is rather limited in its applicability. It does not provide the Court with grounds to depart from the Fifth Circuit precedents . . . ." Id. at *7).

### 3. *Purposeful Availment by Moffett toward Kentucky*

Plaintiffs argue that Moffett has purposefully availed itself of the privilege of acting in Kentucky or causing consequences in Kentucky. Specifically, Plaintiffs contend that the corporate relationship between Moffett and Cargotec, the national distribution agreement between Moffett and Cargotec, Moffett's production of operational materials to accompany the forklifts, the warranty claims process, and Cargotec's websites all demonstrate that Moffett satisfies the purposeful availment requirement and should be subject to jurisdiction in Kentucky. After a review of the record and for the reasons set forth below, the Court finds that Plaintiffs failed to present sufficient evidence to establish that Moffett purposefully availed itself of the privilege of acting in Kentucky

11

or causing a consequence in Kentucky.

Moffett is a foreign corporation with its principal place of business located in Dundalk, Ireland.  Moffett designs and manufactures the forklifts exclusively in Ireland.  Moffett has never maintained a physical presence in Kentucky.  It does not own, possess, or use any property in Kentucky. It has never had any officers, employees, or agents stationed in Kentucky, and it has never sent any of its employees to Kentucky for business purposes.  It has never sought authority from the Kentucky Secretary of State to conduct business in Kentucky.  It has never directly shipped or sold any of its products to customers in Kentucky, and it has never directly solicited business from any company located in Kentucky.  Moffett has never had any contacts with Mr. Lindsey's employer, Perdue.  Moffett has never entered into any contracts or any transactions with Perdue. Moffett has never sold any forklifts to Perdue.  Perdue's sole point of contact is with a Cargotec sales representative.  All forklifts purchased by Perdue were delivered by Cargotec to Perdue in Cromwell, Kentucky.

### a.  Corporate Relationship between Moffett and Cargotec

The corporate relationship between Moffett and Cargotec does not provide a basis for subjecting Moffett to jurisdiction in Kentucky.  Moffett and Cargotec are wholly owned subsidiaries of a parent corporation named Cargotec Oyj, a Finnish Corporation.  Even after discovery on the relationship between Moffett and Cargotec and their parent company, Plaintiffs failed to set forth any facts or supporting case law that would permit the Court to impute Cargotec's activities in the forum state to Moffett.  The record reflects that Moffett and Cargotec have their own officers, directors, and are separate and independent corporate entities.  Additionally, the 2005 Sales and Distribution Agreement clearly provides that Cargotec is not an agent of Moffett.

### b. Distribution Agreement

Since 1996, Moffett and Cargotec have participated in a distribution agreement.  The current Sales and Distribution Agreement was signed in 2005.  Section 1.1. of the Agreement provides that "[t]he Manufacturer hereby grants to the Distributor and the Distributor hereby accepts, subject to the terms and conditions set forth herein, the right to act as a representative of the Manufacturer for the sale of Products in the territory of the USA."  Section 2.1 further defines the rights granted:

> The Manufacturer appoints the Distributor to sell the products in the name of the Distributor and on the account of the Distributor.  The Distributor acts as an independent distributor as regards to both Manufacturer and the customers and shall have no right to assume or create any obligation of any kind, either express or implied, on behalf of the Manufacturer under this Agreement.  Nothing in this Agreement shall be deemed to create a relationship of principal and agent or employer and employee between the Manufacturer and the Distributor.

(2005 Sales and Distribution Agreement § 2.1.)  Thus, under this Agreement, Cargotec has the exclusive right to market and sell Moffett's products in the United States.

Moffett does not control Cargotec's sales or distribution in the United States.  After the forklifts are shipped to Cargotec in Ohio, Cargotec is solely responsible for sales and distribution to its customers.  Contrary to Plaintiffs' assertions, the Agreement does not require Cargotec to sell the products "in the name of Moffett and on account of Moffett."  Instead, the Agreement provides that Cargotec is required to sell the products "in the name of the Distributor and on the account of the Distributor."  (2005 Sales and Distribution Agreement at § 2.1.)  The Agreement specifically provides that Cargotec is acting as an independent contractor, not as an agent, and has no right to assume or create any obligation of any kind on Moffett's behalf. (Id.)  Cargotec sells and markets Moffett products in all fifty states.   Moffett makes no attempt to limit the territory in which Cargotec sells its products.  Cargotec has sold 97 Moffett forklifts in Kentucky from 2000 to 2010.

13

Moffett and Cargotec do not interact or confer regarding pricing.  Cargotec does not provide sales or marketing reports to Moffett.  Moffett does not have access to the computer system Cargotec uses to track sales, and Cargotec does not provide this information to Moffett.  Cargotec does not provide Moffett with a customer list.  Furthermore, Cargotec trains its own sales and service representatives without any participation by Moffett.  Moffett is not involved in Cargotec's marketing activities in the United States.  Cargotec makes all advertising decisions.  Moffett does not assist Cargotec with advertising or marketing efforts.  Although the 2005 Sales and Distributorship Agreement between Moffett and Cargotec allows the companies to share the cost of marketing, Moffett and Cargotec have never used a cost-sharing formula.[3]  Moffett does not reimburse Cargotec for any funds used for marketing or advertising.

Moffett has not had any communications or contact with Cargotec's customers in Kentucky.  Cargotec takes orders from customers and then relays the specifications to Moffett.  Moffett is not aware of the identities or locations of Cargotec's customers at that time.  Moffett does not advertise, market, sell, or distribute its products to Cargotec's customers.  Moffett does not attend trade shows in the United States. Moffett does not provide training or technical support to Cargotec's customers.  Additionally, Moffett does not attend any of the training programs Cargotec provides to its customers.  While Cargotec directs its marketing efforts to certain industries, including the poultry industry, there is no evidence that Moffett directs or controls this marketing strategy.

While the 2005 Sales and Distribution Agreement gives Moffett the right to approve the

---

[3] Section 3.2 of the Sales and Distribution Agreement provides that "[t]he costs incurred by the Distributor in marketing, selling, promoting and servicing the Products shall be on the responsibility of the Distributor.  The costs can be shared according to a formula agreed upon in advance of any specific investment."

appointment of dealers and agents, the record reflects that Moffett never exercised the right.[4]

Specifically, Douglas Heerdegen, the Cargotec corporate representative, testified that Cargotec has

not sought and Moffett has not provided approval for any dealers, agents, or resellers. (Douglas

Heerdegen Affidavit, December 9, 2010, at 100-101.) The record reflects that in selling the Moffett

forklifts, Cargotec primarily uses a staff of sales representatives, including one assigned to sell

forklifts in Kentucky.  Additionally, Cargotec has appointed a dealer in Maine and a reseller, C&L

Services, located in Louisville, Kentucky.  C&L Services is a service partner of Cargotec permitted

to resell Moffett forklifts. (Douglas Heerdegen Affidavit, December 9, 2010, at 54).  Heerdegen

testified that Cargotec had a previous relationship with C&L Services and he was not aware of when

C&L started selling the forklifts.  (Id. at 56.)  While Cargotec sold forklifts to C&L Services in

Kentucky, these sales were solely at Cargotec's discretion.  Cargotec did not seek approval of or

authorization for these sales.  The record reflects that Cargotec did not inform Moffett of the sales

to C&L Services.

The fact that Moffett entered into a nationwide distribution agreement with Cargotec for the

sale of forklifts in the United States with the knowledge that its product would be marketed and sold

in the United States, including Kentucky, is not sufficient to demonstrate purposeful availment of

the Kentucky forum.  See, e.g., Smith v. Home Depot USA, Inc., 294 Fed. Appx. 186, 190 (6th Cir.

2008)("Although the licensing agreement gave Krause, Inc. 'the right to use the Trademarks in

connection with the sale, marketing or promotion of Products within the Territory,' which was

---

[4]Section 4.1 of the Sales and Distribution Agreement provides that "[t]he distributor shall
have a right to appoint dealers and agents in the Territory.  The dealers and agents shall be
subject to the approval of the Manufacturer.  The Distributor shall be responsible to the
Manufacturer for the activities of its dealers and agents."

defined as 'North and South America,' . . . , there was nothing in the Licensing Agreement that *required* Krause, Inc. to market the ladders in Tennessee specifically."); <u>Bridgeport Music</u>, 327 F.3d at 480 (distribution agreement did not require or place "an affirmative obligation upon the third party to distribute [the product] in Tennessee or elsewhere."); <u>Static Control Components, Inc. v. Lexmark Intern., Inc.</u>, 2005 WL 2009273, *6 (E.D. Ky. Aug. 19, 2005). The Sales and Distribution Agreement grants Cargotec the right to distribute the forklifts throughout the United States, but does not require them to be distributed in any state forum. Specifically, § 1.1. provides that "[t]he Manufacturer hereby grants to the Distributor and the Distributor hereby accepts . . . the right to act as a representative of the Manufacturer for the sale of Products in the territory of the USA." (Sales and Distribution Agreement at § 1.1.) The right to sell its products in the United States "is a far cry from a *requirement* to sell in" Kentucky. <u>Smith</u>, 294 Fed. Appx. at 190. Moffett placed the product in the stream of commerce, "but there is nothing more here to show that [Moffett] purposefully directed the [forklifts] toward the forum state of [Kentucky]." <u>Id.</u>

Moffett did not control the manner in which Cargotec distributed the products, had no control over the pricing, marketing, or advertising of the forklifts, and had no access to any customer list. Furthermore, Moffett had no contact with any of Cargotec customers, including C&L Services. Because Moffett's distribution agreement with Cargotec to market and sell forklifts to the national market "is *not* conduct that targets any specific forum State," <u>Octicon, Inc. v. Sebotek Hearing Systems, Inc.</u>, 2011 WL 3702423, *12 (D. N.J. August 22, 2011), and in light of Moffett's lack of control over the distribution of the forklifts under the agreement, the Court concludes that it cannot exercise personal jurisdiction over Moffett based on the national distribution agreement between Moffett and Cargotec.

16

### c. Operator Manual, Welcome Kit, Orientation CD, Spare Part Manual or CD

The Court also rejects Plaintiffs' argument that Moffett's production of the operator manual, spare parts manual, and orientation video supplied by Cargotec to its customers, along with the availability of Moffett's name, address, telephone number, and e-mail address located on the back of the operator manual, establish that Moffett purposefully availed itself of the opportunity to do business in Kentucky. The record reflects that at the time of delivery of the forklift to the customer, a Cargotec sales representative is present on site to provide the customer with a basic operator orientation, including an overview of functions and features of the forklift. When the forklift is delivered, the operator manual is given to the customer. After the delivery is made, Cargotec will send in a separate package a Welcome Kit that contains a spare parts manual or CD, another operator manual, an operator orientation CD, and a description of the warranty offered. (Heerdegen Aff. at 76.) The operator manual, the spare parts manual or CD, and the operator orientation video is produced by Moffett and provided to Cargotec with each forklift purchased by Cargotec. (Id. at 77.) These materials are then supplied by Cargotec to the customer. The operator manual includes Moffett's name, address, telephone number and e-mail address.

The preparation of this material, like the design and manufacture of the Moffett forklift, does not subject Moffett to the jurisdiction of Kentucky. Plaintiffs produced no evidence that this material is prepared in Kentucky or sent by Moffett to Kentucky. Moffett provides the materials to Cargotec along with the forklift purchased by Cargotec. Cargotec then provides the materials to its customer. Furthermore, there is no evidence in the record suggesting that the customers in Kentucky had any contact with Moffett as a result of the Moffett's contact information on the back of the operator's manual. Instead, the customers contact Cargotec sales representatives regarding any

17

questions related to the forklifts or the materials provided by Cargotec.  In fact, Perdue confirmed

that it never had any contact with Moffett.  Instead, its sole point of contact was a Cargotec sales

representative.

### d. Warranty Claims Procedure

Similarly, the Court finds that the warranty claims procedure is not sufficient to establish the

purposeful availment requirement.  Pursuant to §§ 9.1 and 9.2 of the Sales and Distribution

Agreement, "[t]he Manufacturer shall provide a warranty to the Products according to the global

warranty rules of the Manufacturer" and "[t]he Distributor shall grant the same level of warranty to

its dealers or customers as granted to it by the Manufacturer."  (2005 Sales and Distribution

Agreement at § § 9.1 and 9.2.)  Mr. Heerdegen testified that if a purchaser makes a service request

regarding a Moffett forklift, Cargotec service technicians respond to the service call at the

purchaser's location and/or order a part from Moffett.  When a warranty claim is made by a

purchaser, Cargotec will inspect the forklift and will approve or disallow the warranty repair.  If

Cargotec makes a determination that it is a warranty repair, Cargotec then submits the warranty

claim to Moffett.  (Heerdegen Aff. at 66-67.)  In submitting the warranty claim to Moffett, Cargotec

utilizes a program produced by Moffett and Cargotec provides the date of the claim, the date of

repair, and the location of the repair.[5]  (Id. at 69-70.)  If Moffett accepts the warranty claim, Moffett

then processes and issues a credit note to Cargotec.  If Moffett denies the warranty claim, Cargotec

internally deems "it as a goodwill warranty."  (Id. at 67-68.)

Contrary to the representations of Plaintiffs, Cargotec acts independently of Moffett in

---

[5]The warranty claims in the record reflect that Cargotec when submitting a claim to
Moffett did not include the location of the end-customer on every occasion.

determining whether a claim submitted by one of Cargotec's customers is covered under the warranty issued by Cargotec. The purpose of Cargotec's submission of the warranty claim to Moffet is to obtain reimbursement under the manufacturer warranty provided by Moffett to Cargotec. (Sales and Distribution Agreement §9.1.) The purchaser's warranty claims are not made directly to Moffett; they are made directly to Cargotec. Cargotec controls the decision of whether a particular repair of a customer's forklift is covered under the terms of the warranty provided by Cargotec. Significantly, as discussed above, Moffett's approval or denial of Cargotec's warranty claim does not impact Cargotec's warranty decision. (Heerdegen Aff. at 67-68). Furthermore, the fact that Moffett was aware the location of some of Cargotec's customers who submitted warranty claims to Cargotec, including three warranty claims submitted by Perdue, does not demonstrate that Moffett purposefully availed itself of doing business in Kentucky. Mere knowledge of sales to a particular forum State is not enough to establish jurisdiction. See Bridgeport Music, Inc., 327 F.3d at 480; Smith, 294 Fed. Appx. at 189-190.

**e. Websites**

Finally, the Court rejects Plaintiffs' argument that Moffett should be subject to jurisdiction in Kentucky because customers throughout the United States can access certain websites maintained by Cargotec that provide information regarding Moffett forklifts and permit potential customers to contact Cargotec regarding the forklifts. The websites, www.cargotec.com and www.hiab.com, are maintained by Cargotec, not Moffett. There is no indication that Moffett controls, maintains, or even offers input regarding the content of these websites. Furthermore, Plaintiffs have not set forth any evidence regarding any interaction or exchange between Cargotec and forum residents via the website. As a result, the Court concludes that the websites in question do not provide a basis for

19

exercising jurisdiction over Moffett.  <u>Static Control Components, Inc. v. Lexmark Intern., Inc.</u>, 2005 WL 2009273, *4 (E.D. Ky. Aug. 19, 2005); <u>QSR Automations, Inc. v. KRS Corp., LLC</u>, 2010 WL 1416700 (W.D. Ky. March 31, 2010).

These facts fail to demonstrate that Moffett purposefully availed itself of personal jurisdiction in Kentucky.  Moffett has no direct contact with Kentucky, nor exercises any control over or participates in Cargotec's activities in Kentucky.  The nationwide distribution agreement only gives Cargotec the right to sell and market the forklifts in the United States; it does not require the sale or advertisement of the product in Kentucky.  Under these circumstances and in light of current Sixth Circuit precedent, the Court finds that the contacts between Moffett and Kentucky are "too random, fortuitous, and attenuated for a finding of purposeful availment."  <u>Bridgeport Music</u>, 327 F.3d at 481.   Accordingly, Moffett cannot be subject to jurisdiction in Kentucky.[6]

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the renewed motion by Defendant, Moffett Engineering, Ltd. ("Moffett"), to dismiss for lack of personal jurisdiction

---

[6] The Court is aware of the recent opinions issued in <u>Ainsworth v. Cargotec USA</u>.  In <u>Ainsworth v. Cargotec USA, Inc.</u>, 2011 WL 1814111 (S.D. Miss. May 9, 2011), relying upon Justice Brennan's <u>Asahi</u> plurality opinion and Fifth Circuit precedent, the district court found that plaintiffs had satisfied the minimum contacts prong of the due process analysis because they presented evidence that Moffett placed its product in the stream of commerce destined for sale throughout the United States, and it was foreseeable that it would be subject to suit in Mississippi.  <u>Id</u>. at *3-*4.  On a motion to reconsider in light of <u>McIntyre</u>, 131 S.Ct. 2780, the district court held that the United States Supreme Court opinion in <u>McIntyre</u> did not provide the district court with grounds to depart from Fifth Circuit precedent and declined to reconsider its decision in light of <u>McIntyre</u>.  <u>Ainsworth v. Cargotec USA, Inc.</u>, 2011 WL 4443626, *7 (S.D. Miss. Sept. 23, 2011).  These cases are not persuasive authority because the Sixth Circuit has specifically rejected Justice Brennan's stream of commerce theory relied upon by district court and the Fifth Circuit.

pursuant to Fed. R. Civ. P. 12(b)(2) [DN 82] is **GRANTED**.

cc: counsel of record